We'll hear argument this morning in Case 23-477, United States v. Skrmetti. General Preloger. Mr. Chief Justice, and may it please the Court, this case is about access to medications that have been safely prescribed for decades to treat many conditions, including gender dysphoria. But SB-1 singles out and bans one particular use. In Tennessee, these medications can't be allow a minor to identify with or live as a gender inconsistent with the minor's sex. It doesn't matter what parents decide is best for their children. It doesn't matter what patients would choose for themselves. And it doesn't matter if doctors believe this treatment is essential for individual patients. SB-1 categorically bans treatment when, and only when, is inconsistent with the patient's birth sex. Tennessee says that sweeping ban is justified to protect adolescent health. But the state mainly argues that it had no obligation to justify the law and that SB-1 should be upheld so long as it's not wholly irrational. That's wrong. SB-1 regulates by drawing sex-based lines and declares that those lines are designed to encourage minors to appreciate their sex. The law restricts medical care only when provided to induce physical effects inconsistent with birth sex. Someone assigned female at birth can't receive medication to live as a male, but someone assigned male can. If you change the individual's sex, it changes the result. That's a facial sex classification, full stop, and a law like that can't stand on bare rationality. To be clear, states have leeway to regulate gender-affirming care. But here, Tennessee made no attempt to tailor its law to its stated health concerns. Rather than impose measured guardrails, SB-1 bans the care outright no matter how critical it is for an individual patient. And that approach is a stark departure from the state's regulation of pediatric care in all other contexts. SB-1 leaves the same medications and many others entirely unrestricted when used for any other purpose, even when those uses present similar risks. The Sixth Circuit never considered whether Tennessee could justify that sex baseline. Because the Equal Protection Clause requires more, this court should remand so that SB-1 can be reviewed under the correct standard. I welcome the court's questions. Much of the latter part of your opening statement suggests that the, well, it seemed to suggest that there's an outright ban on this treatment. But that's not the case. It's really for minors. So why isn't this simply a case of age classification when it comes to these treatments as opposed to a ban, as you suggested in your opening statement? It's certainly true, Justice Thomas, that the statute classifies based on age, but it packages that age classification with a sex restriction and says that for all adolescents, you cannot take these medications if they're inconsistent with your sex. So I acknowledge that the state so far has not banned this care for adults, although I think that the arguments it's making that this isn't a sex baseline in the first place would equally apply in that context. But the court has likewise made clear that when you classify on the basis of multiple characteristics, you can't avoid heightened scrutiny just because you have a non-protected characteristic that accompanies the protected one. And if you look at it from the standpoint of the plaintiffs who are actually affected by this law, the reason I'm calling it a categorical ban is because the state has left no out for those patients to obtain these medications when there's a showing of individualized medical need. And that is, I think, a stark departure from how the state ordinarily handles issues related to measuring risks and benefits, even in the pediatric context. Well, is there no difference if a girl takes testosterone or if a boy takes testosterone? So the district court specifically considered this question in detail and found that with respect to the risks that the state had identified, it was not substantiated that there would be unique risks associated with a broad sex use of hormones. Is there a physiological difference? Certainly, I understand that there are biological differences between males and females, but when it came to the specific risk factors that the state was focused on, what the district court found is that many of those risk factors would exist regardless of the birth sex of who was taking the medication. Well, I'm more interested in whether or not there is a difference in testosterone and its reaction in a male as opposed to in a female, and vice versa for estrogen. So if you take hormones, they will prompt the development of secondary sex characteristics in whether you're a male or a female. If you take testosterone, you might develop a deeper voice register. You might have facial hair growth. And, in fact, that's one of the intended effects of these treatments because that can be critical to helping manage gender dysphoria that transgender adolescents would otherwise experience. But I think when it comes to the question of whether that creates unique risks, the district court found that for the most part the state had not substantiated those risks and that it leaves regulation of medication unrestricted even in contexts where these same medications or others would pose a comparable set of risks. General, can I just... Counsel, you rely very heavily in your briefing on cases like Morales-Santanas, which was about the distinctions between men and women when it came to adoption and things of that sort. Here, it seems to me that the medical issues are much more heavily involved than in many of the cases that you look to, including, I understand there's a dispute between both sides on how extensive any evolution or increase in uncertainty in Europe has been and elsewhere. And, of course, we are not the best situated to address issues like that, unlike in, you know, Morales and Craig B. Boren and some of the other ones where it doesn't strike me that they're intensely affected by medical considerations. And if that's true, doesn't that make a stronger case for us to leave those determinations to the legislative bodies rather than try to determine them for ourselves? So let me respond to that concern with a couple of different points, Mr. Chief Justice. I certainly take the point that you might think that states should have a lot of leeway to regulate when it comes to medical uncertainty, and we're not arguing otherwise. If the state is not restricting access to medications on the basis of a protected characteristic, that is only going to be rational basis review from the outset. And it's only in a circumstance where the state is saying your access to drugs depends on your birth sex or your sex generally that the court would apply heightened scrutiny. But even at that stage, I don't think it's necessary for the court to step in and suggest that states have no ability to draw those kinds of lines. And I think this relates to my point in colloquy with Justice Thomas as well. We, of course, recognize that if there is a lot of medical uncertainty or differential risk, and if the state can actually come forward and show that it has an important reason to restrict access based on sex, that can be taken into account in heightened scrutiny, and it wouldn't provide a basis to displace the state legislatures altogether from weighing this evidence. But I think it would be a pretty remarkable thing for the court to say that just because we're in the space of medical regulation, you are not going to apply the traditional standards that ordinarily are applied when there's a sex classification. Well, I guess I wouldn't say just in the area of medical regulation. It's more in the area of evolving standards and technical treatment issues and the effect of certain prescribing particular medications. That seems to me to be very much in the area of medical nuances, unlike, you know, Craig B. Boren, different drinking ages or moralis. Can men and women adopt children in the same way? And I think the court could recognize that concern can be accommodated under intermediate scrutiny. It is not like strict scrutiny where states are automatically prohibited from drawing lines based on sex. They just have to come forward and demonstrate that they do have an important state interest. And I don't think it would be any different, Mr. Chief Justice, than if the state were to say, we think there is some concern about safety and efficacy for this drug with respect to women, so we're going to ban women from taking it. The court would recognize that's a facial sex classification, and then the role for the court is not to come in and entirely second-guess the legislature, but you would ask questions like, well, is there evidence to suggest it's risky for women but not for men? And what does the state do when there's comparable risk in other contexts? Does it just ban medication outright, or are there less restrictive measures? And could the state have tailored its approach to the unique concerns and try to potentially screen for the people for whom this would be safe and effective while enacting a more tailored law to try to safeguard against that important state interest? So I don't think we're asking the court to break new ground in this case, and in fact, we don't even think the court needs to delve into the heightened scrutiny analysis itself here. We think it would be sufficient for the court to recognize that a law that on its face says you can't have medications inconsistent with sex is a sex classification, but then you could send this case back and have the Sixth Circuit do the heightened scrutiny analysis in the first instance. General, can I ask you a question about the state of medical evidence at the present time? In your petition, you made a sweeping statement, which I will quote, overwhelming evidence establishes that the appropriate gender-affirming treatment with puberty blockers and hormones directly and substantially improves the physical, psychological well-being of transgender adolescents with gender dysphoria. That was in November 2023. Now, even before then, the Swedish National Board of Health and Welfare wrote the phone. They currently assess, quote, that the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments, which is directly contrary to the sweeping statement in your petition. After the filing of your petition, of course, we saw the release of the CAS report in the United Kingdom, which found a complete lack of high-quality evidence showing that the benefits of the treatments in question here outweigh the risks. So I wonder if you would like to stand by the statement that you made in your petition, or if you think it would now be appropriate to modify that and withdraw the statement that there is overwhelming evidence establishing that these treatments have benefits that greatly outweigh the risks and the dangers. I, of course, acknowledge, Justice Alito, that there is a lot of debate happening here and abroad about the proper model of delivery of this care and exactly when adolescents should receive it and how to identify the adolescents for whom it would be helpful. But I stand by that there is a consensus that these treatments can be medically necessary for some adolescents, and that's true no matter what source you look at. You mentioned both the CAS report and Sweden. It can be medically necessary for some minors. But for the general run of minors, do you dispute the proposition, in fact, that in almost all instances, the judgment at the present time of the health authorities in the United Kingdom and Sweden is that the risks and dangers greatly outweigh the benefits? Do you dispute that? I do dispute that because if you actually look at how those jurisdictions are addressing this issue, they have not outright banned this care. The CAS report says at multiple points that this care can be medically indicated for some transgender adolescents. And, of course, it's true that they have called for a more individualized approach to these issues and have questioned whether it should be readily applied to all adolescents as a matter of course. Is it not true that in England, I'm sorry to interrupt, but time is running out, that the National Health Service some months ago limited the prescription of puberty blockers to adolescent males who are over the age of 16 and are already on estrogen. But for those who are under the age of 16, it's allowed only for experimental purposes. Is that not true? So the approach in the UK right now is to allow hormone therapy for anyone 16 and older. And with respect to puberty blockers, the UK has restricted new prescriptions outside of research settings. But the CAS implementation plan itself makes clear that if a medical team determines that these medications are necessary for a particular patient, they will be provided. And the restriction that I mentioned was imposed by the British government some months ago. It was reaffirmed by the current labor government, was it not? It was upheld by the High Court of Justice as based on sufficient medical evidence. Is all of that true? I believe that all of that's true. It's outside the record in this case. And so I haven't myself confirmed everything that you just cited, which wasn't before the district court in this case. But let me make a couple of additional points. To the extent that you think that this needs to be taken into account in the application of heightened scrutiny, there's a time and a place for that. And it's with record evidence on remand. We think the court here just needs to recognize the sex-based classification in this statute and send the case back. If the court wants to go ahead and look at what's happening in Europe, the UK has not categorically banned this care. Sweden, Finland, and Norway, the other jurisdictions that my friends point to, have not banned this care. And I think that's because of the recognition that this care can provide critical, sometimes life-saving benefits for individuals with severe gender dysphoria. Thank you, counsel. Justice Thomas, anything further? Justice Alito? In your opening brief, you did not mention any of these European developments. And in your reply brief, is it not true that you just relegated the CAS report to a footnote? So, Justice Alito, with respect to the developments, there has been no change in the law that I'm aware of in Sweden, Finland, and Norway. Each of the medical authorities in those states has called for an individualized approach to care. They've said it shouldn't be routinely applied. But they have not changed their law to do anything like what Tennessee is doing here, which is to categorically ban it no matter the need. With respect to the CAS report, that isn't in the record in this case, but we have discussed that report in our reply brief. And as I just noted, it likewise recognizes the need for this care in individual cases. The UK has not banned the care, and Hillary Casp is not calling for such a ban. Your primary argument in the oral presentation this morning is based on Bostock-like reasoning. Is that not correct? I think that's incorrect. Our primary argument is that this statute, on its face, says you can't have medications inconsistent with sex. And no matter what you transgender discrimination generally, that's a sex-based line. It's no different than saying you can't dress inconsistent with your sex. My friends concede, on page 25 of their brief, that's obviously a facial sex classification. But our primary argument is SB1 is worded exactly the same way, and it works exactly the same way. Well, you have a Bostock-like argument, and you say that a girl who wants to live like a boy cannot be administered testosterone, but a boy who wants to live like a boy can be administered testosterone. And that's one of your major arguments. I take that to be a Bostock-like argument. So my question is, why should we look to Bostock here? Bostock involved the interpretation of language in a particular statute. And this is not a question of statutory interpretation. It's a question of the application of the Equal Protection Clause of the 14th Amendment. And the Court has addressed the question, how an equal protection claim should be analyzed when the law in question treats a medical condition or procedure differently based on a characteristic that is associated with just one sex. And that was Godaldig in 1974, reaffirmed in Dobbs in 2022. And neither Bostock nor Dobbs saw any connection between the Bostock reasoning and the Godaldig Dobbs standard. Bostock did not mention Godaldig, and Dobbs did not mention Bostock. So why should we look to this Bostock-type reasoning here? So with respect to how to identify a facial sex classification in the first place, I don't think there's any relevant difference between the Court's approach in Bostock and what this Court has long done under the Equal Protection Clause. In both contexts, the Court has made clear that the right to equal treatment is an individual right. So you look at the particular person and see how the law affects them. And the Court in both contexts has already made clear that sex just needs to be one but-for causal factor. It doesn't have to be the sole reason or the primary reason. So for purposes of identifying whether facial sex classification is happening at the outset, we think it's equal protection principles as much as Bostock that carries the day, although, of course, Bostock reinforces those principles. You asked why this case isn't controlled by Godaldig and Dobbs. The Court's reasoning there was that when you have a statute that doesn't classify based on sex on its face at all, the fact that the medical condition might be something that one sex can experience isn't a basis to necessarily say that's facial sex discrimination. But that doesn't apply in any relevant respect here, first, because here we have the facial sex classification. The statute says no medications that are inconsistent with your sex. And second, these aren't drugs that are limited to one sex or another. Both males and females alike for decades have been prescribed puberty blockers, hormones, testosterone, estrogen. They produce the same characteristics as I was saying to Justice Thomas, no matter whether your birth sex is male or female. So this doesn't look anything like pregnancy, where the Court found that the medical condition itself was expressly limited to one sex. Well, I'm not sure that's anything more than a play on words. Suppose the statute said, let's just talk about puberty blockers. Suppose the statute said that puberty blockers may not be prescribed or administered to any minor for the purpose of preventing the onset of puberty prior to the time when puberty generally occurs. Okay, that statute makes no reference whatsoever to anybody's sex. It applies to all minors. Would you say the same thing about that? So, I'm sorry, if I'm understanding the hypothetical correctly, the statute says you can't take puberty blockers before the time when you would ordinarily have puberty, so it's ruling out precocious puberty? No, it doesn't rule out precocious puberty. It rules out the administration of a puberty blocker for the purpose of preventing puberty from occurring at the time when it generally does. I see. So if you're hypothesizing a statute where, in essence, the legislature is trying to get at the idea of prohibiting access to these medications for gender dysphoria reasons or otherwise, then maybe you would apply an Arlington Heights type of analysis. But, of course, that kind of law that you're hypothesizing would also prevent people from taking puberty blockers if they have cancer and want to preserve their fertility because it would prevent them from undergoing puberty at the ordinary time. I think that's why the legislature hasn't tried to circumvent the facial sex classification by drafting a law like that. It would have many other applications that the state might not want to That's very different from a law like this where the state was being clear, we only want to prevent the medications when it's inconsistent with sex, and we're doing that because we have an interest in having minors appreciate their sex and not be disdainful of their sex. Let me ask one final question that addresses Gedulding and Dobbs. Let's take Gedulding first. One could make the same argument in Gedulding that you've made here. A man cannot, which concerned whether a pregnant woman was entitled to disability benefits for time missed at work when a man would be entitled to benefits for time missed at work. So, in that situation, a man cannot work due to a medical condition that prevents him from working, he gets benefits. A woman cannot work due to a medical condition, pregnancy, that prevents her from working for a period of time. She doesn't get benefits. It's the same argument you're making here. Well, we could do it in Dobbs. A man who has a medical condition that causes physical and mental distress and pain and limits his daily activities cannot, can get a corrective medical procedure. Let's say it's a hip replacement. But a woman who has a medical condition that produces similar consequences, namely pregnancy, cannot get an abortion. So you can make exactly the same argument that you make here under Gedulding and under Dobbs, and yet there was no equal protection problem in either of those cases. And that's because the court said that there was no facial sex classification insofar as using pregnancy does not automatically mean that that's a proxy for sex. But here, there's a facial sex classification. No one can take these medications if it would be inconsistent with their sex, and that's imposing on the face of the statute two parallel rules on classes of people according to their sex. All adolescent males who want to take these medications to feminize their bodies, and all adolescent females who want to take these medications for masculinizing purposes. That's a facial sex classification through and through, and I don't think it's controlled by Dobbs or Gedulding. Thank you, General. Justice Sotomayor? General, just to unpackage some of this argument, your point I think is very clear that Bostock is pertinent only to the extent that whether it's Title VII or the Equal Protection Clause, the first question is, is the legislature using sex as a classification, correct? That's right. So our argument is that when you're looking for whether there's a facial sex classification under the Equal Protection Clause, it has always been the same but-for causation principles. And of course we agree with the logic of Bostock, but we think that that logic carries over in this context where the court has already said it just needs to be one but-for cause. It doesn't need to be the only cause. And one way you look at that is seeing whether the application of the statute changes when you change the person's sex. Now, Bostock is very different in this case because in Bostock what we said is if you use sex at all, unless you have a statutory exemption, you can't do it, correct? Exactly. And I think that's-And here, under the Equal Protection Clause, we recognize there are inherent differences between the sexes. And that can sometimes provide a legitimate basis for classification. That's the point. So you're exactly right. The standards for liability are different under Bostock and Title VII. With respect to the discussion about the European countries and the fact that they haven't limited these treatments altogether, the CAS report, as you point out, explicitly says that medical intervention might be necessary for some adolescents, correct? That's right. And that is recognized by all the European countries, correct? Yes. I think it's reflected in the laws of those countries which have not outright banned the care. Isn't the purpose of intermediate scrutiny to make sure that we guard against our-I want to-I'm not intending to insult, but we all have instinctual reactions, whether it's parents or doctors or legislatures, to things that are wrong or right. For decades, women couldn't hold licenses as butchers or as lawyers because legislatures thought that we weren't strong enough to pursue those occupations. And some people rightly believe that gender dysphoria may cause-may be changed in some children. But the evidence is very clear that there are some who actually need this treatment, isn't there? Yes. I think the evidence is uniform on that. Whether you look at the standard of care, whether you look at the view of every major American medical association that has taken a position, many of whom are amici here, it's reflected in the clinical practice. The nation's leading children's hospitals for decades have been providing this care. Some children suffer incredibly with gender dysphoria, don't they? Yes. It's a very serious medical condition. Some attempt suicide? Yes. The rates of suicide are striking, and it's a vulnerable population. Drug addiction is very high among some of these children because of their distress, correct? It is a serious condition, yes. One of the petitioners in this case described throwing up every day, going almost mute because of his-because of their inability to speak in a voice that they could live with. These are physically challenging situations as well, too, correct? Yes, that's correct. And isn't the purpose of intermediate scrutiny, the level of scrutiny that we apply, necessary to ensure that whether it's legislatures or this court, that we don't make those personal judgments, but that we subject the judgments about these issues to a heightened review to ensure that those children who are going to suffer all of these consequences will be made to do so only when it's compellingly necessary? Yes, in a circumstance where the state has an important interest, and we don't think that means the states are entirely barred from regulating in this space. Obviously, they are grappling with these issues in a variety of contexts, but you're right to say that when the state is using sex-based line drawing, a court needs to look at that. And the problem with Tennessee's law here is not that it's just a little bit over-inclusive or a little bit under-inclusive, but that it's a sweeping categorical ban where the legislature didn't even take into account the significant health benefits that can come from providing gender affirming care, including reduced suicidal ideation and suicide attempts, and where the state leaves unregulated entirely access to these treatments in all other pediatric contexts where there's a similar risk-benefit trade-off. And for the families affected by this, Justice Sotomayor, these are difficult decisions. Obviously, any time you're thinking about a medical intervention, you need to weigh risks and benefits, but the state has come in here, and in a sharp departure from how it normally addresses this issue, it has completely decided to override the views of the parents, the patients, the doctors who are grappling with these decisions and trying to make those trade-offs. Thank you. Justice Kagan? General, I wanted to get your thoughts first on why one should think of this as primarily a sex-based classification, because there's another way of looking at a law like this, maybe a more obvious way, which is that it's a classification based on transgender status. In other words, there are trans young people on one side of the line and cis young people on the other side of the line, both male and female on both sides of the line. And why what is really going on here, I understand the formal ways in which this is a sex-based classification, but I'm wondering whether that's not a little bit formal, and what's really going on here is a discrimination against, a disregard for young people who are trans, and why we shouldn't think of the law in that way. I think you can conceive of the law in that way, and we certainly do think that this law discriminates on the basis of transgender status, and that likewise should trigger heightened scrutiny, both because that's inherently a sex-based classification and because we think transgender status discrimination warrants heightened scrutiny in its own right. But I don't think it's unduly formal to look at this as a sex classification, and the reason for that is because of the first operative provision of SB1, which says you can't have these medications to live or identify in a manner inconsistent with your sex. That is quintessentially imposing sex-based rules and expectations on adolescents in the state, and it's true it arises in the context of medical care for transgender youth, but here we think it's a very straightforward path for the to look at that and say, well, in any other context, when you say you can't do something inconsistent with a protected characteristic, that's obviously classifying people on the basis of that characteristic, and here it wasn't accidental or incidental. This is threaded throughout the statutory scheme because the legislature was quite upfront that part of the interest here is in ensuring that minors appreciate their sex and not become disdainful of their sex, or as Judge White put it in the sent below, that they look and live like boys and girls, and I think that adds on an additional layer of sex classification here insofar as it shows that part of what the state was attempting to do is ensure that adolescents conform their bodies to the state's physical expectations of how males and females should appear. It's not at all surprising to think of that as a sex classification. So is what you're saying is that the two are just embedded in each other, or is what you're saying that sex stereotyping is built into our understandings of trans and cis classifications, or again, is that this more sort of logical analysis that might be found in an opinion like Bostock, and maybe those are not exclusive, but, you know, what's your sense of that? So I think those aren't exclusive. I think they're reinforcing here, and I guess what I would say is I think this is an even easier sex classification than maybe the one the court confronted in Bostock or the one the court would if the statute simply discriminated on the basis of transgender status, because here the legislature actually put the sex classification into the face of the law and made the first order restriction here one that prohibits inconsistency with sex, and I just go back to the kinds of examples we give about dressing inconsistent with sex or pursuing a profession inconsistent with sex. You know, I think the court's recognition that that is a sex classification is obviously right, but it also can build in a layer of conformance with sex stereotypes that might be underlying those laws and that we think equally underlie this one. So let me flip now to what it means to do heightened scrutiny in this area, because as you point out, this law, and I think almost all of the similar or maybe all of the similar laws that have been passed like this, allow this exact same kind of treatment for the opposite purpose, if you will, for, you know, a person born male who wants to get to puberty already. And you say that that's a kind of under-inclusion problem. And, you know, it strikes me that on formal equal protection analysis, it is, unless the state can come with some piece of medical evidence that says that the risks are greater in the one area than in the other area, which you say Tennessee has not done. I guess what I'm asking is, like, isn't the structure of these laws going to mean that all of them are going to have to be struck down once you get to heightened scrutiny? Because you seem to want to say, no, you can do heightened scrutiny, but you can also make certain deferential moves towards the legislature. And I guess I'm pressing you on whether that's really true. So I think it is true. To be sure, we think that a categorical ban like this one is severely under-inclusive and also severely over-inclusive, which is an important ingredient here, and so should be invalidated. And if other states likewise have this kind of sweeping ban, then they would fail under heightened scrutiny. But I don't think that means that heightened scrutiny ties the hands of the states in this regard. One of the problems with the state's approach here is that although it has targeted this gender-affirming care for disparate treatment on the basis of sex, as we say, it has leaved these exact same medications entirely unregulated for all other purposes and also turned its back on how it handles the risk-benefit calculus with respect to all other pediatric treatments. But we do think there is a real space for states to regulate here, and I point to the example of West Virginia. West Virginia was thinking about a total ban like this one on care for minors, but then the Senate Majority Leader in West Virginia, who's a doctor, looked at the underlying studies that demonstrate sharply reduced associations with suicidal ideation and suicide attempts, and the West Virginia legislature changed course and imposed a set of guardrails that are far more precisely tailored to concerns surrounding the delivery of this care. West Virginia requires that two different doctors diagnose the gender dysphoria and find that it's severe and that the treatment is medically necessary to guard against the risk of self-harm. The West Virginia law also requires mental health screening to try to rule out confounding diagnoses. It requires the parents to agree and the primary care physician to agree, and I think a law like that is going to fare much better under heightened scrutiny precisely because it would be tailored to the precise interests and not serve a more sweeping interest like the one asserted here in having minors appreciate their sex. Thank you, General. Justice Gorsuch? Justice Kavanaugh? First, I want to ask about our role here and pick up on the Chief Justice's questions at the beginning. Who decides? You've put forth forceful policy arguments to allow these medical treatments, and Justice Sotomayor's questions elaborated on that, but the 20-plus states on the other side put forth very forceful against allowing these medical treatments for minors, so it seems to me that we look to the Constitution, and the Constitution doesn't take sides on how to resolve that medical and policy debate. The Constitution's neutral on the question. At least that's one way to look at it. I want to get your reaction to that. You know, if the Constitution doesn't take sides, if there's strong, forceful, scientific policy arguments on both sides in a situation like this, why isn't it best to leave it to the democratic process? Well, I do think that the Constitution takes the position that individuals are entitled to equal protection of the law, and I totally understand the force of your intuition that states need space to regulate and to try to take into account concerns like adolescent health. We're not denying that that's important interest here, but when you look at how this law actually operates, what it is doing is denying individual plaintiffs the ability to access medications on the basis of their sex, and that doesn't mean that the states are disabled from taking into account the actual biological differences between males and females, but that has to be channeled to the heightened scrutiny stage, and I think that there would be a real danger in this court saying, looking ahead, essentially, and saying, we think there might be benign justifications here, or we think that states should have some flexibility in this regard to overlook the facial sex classification in the statute. If you are concerned, Justice Kavanaugh, about moving too fast in this space and maybe restricting the ability of states to take a close look at these issues, I think the court could write a very narrow opinion in this case, and the court could say simply that when you prohibit conduct that's inconsistent with sex, that is a sex-based line, so you do have to apply heightened scrutiny, but the court has made clear that that's an intermediate standard, and if the state can come forward with an important interest and substantiate that it needed to draw those sex-based lines to substantially serve the interest, that's going to be okay. Just on, keep going, sorry. And the final point is, and you can send it back and let the Sixth Circuit grapple with this in the first instance. On the sex discrimination point, I guess, picking up on Justice Kagan's questions, the way you would think about this is, I guess, it prohibits all boys and girls from transitioning using certain medical treatments, and it doesn't say only boys can do so, or only girls can do so. Well, I think that the problem with trying to put that transitioning label on it as a basis to avoid the sex classification is that transition itself is inherently tied to sex. In other words, the prohibited purpose here are those treatments that would allow a minor to live and identify inconsistent with sex, and the statute would permit anyone to have those treatments for the non-prohibited purpose, which, again, is when it's consistent with sex. The court has said many times that labels don't control in this space, and I think when you have that kind of purpose that's expressly defined using sex-based line drawing, you have to recognize that for what it is. And no matter how you articulate the standard, whether it's rational basis or intermediate scrutiny, it'll come down to whether the state, and I think you said this, has sufficient justification for limiting these treatments for minors, and the state says its justification here is health and safety for minors. You say there are benefits from allowing these treatments, but there are also harms, right, from allowing these treatments, at least the state says so, including lost fertility, the physical and psychological effects on those who later change their mind and want to detransition, which I don't think we can ignore. We can't ignore what you're talking about and what Justice Sotomayor raised, I agree with that, but you can't ignore, I think, the risks on the other side of the balance. So even if it is intermediate scrutiny or rational basis, those justifications for the state, how do we as a court choose which set of risks is more serious in deciding whether to constitutionalize this whole area? So let me react to a couple of different points you brought up. First of all, I do think that the standard of review very much matters, and the court has made clear that rational basis is an entirely forgiving standard. It applies to mundane economic regulation where there's no reason for courts to take a closer look. So I think the court should hold the line that any time the state classifies based on sex, you do need to take a look at that. But I totally take the point that, of course, when a state is coming forward with an important interest like protecting adolescent health, that may well justify the lines the state has drawn. And it's not about asking courts to step in and make a first order determination about how to weigh risks and benefits. But I do think that the state is under a basic obligation to first substantiate its concern, and here there were extensive factual findings by the district court that many of the risks that the state was asserting are not uniquely tied to gender-affirming care at all, and also to take into account the harms that would come from categorically banning access to medications on the basis of drugs, including the benefits that I was discussing with Justice Sotomayor. You mentioned fertility and regret, and I'd like to take both of those concerns head on. I do want to acknowledge that there is evidence to suggest that gender-affirming care with respect to hormones can have some impacts on fertility. Critically, puberty blockers have no effect in and of themselves on fertility, so I don't think that concern can justify the ban on puberty blockers, which is just pressing pause on someone's endogenous puberty to give them more time to understand their identity. With respect to hormone use, there are some effects on fertility, but the court found that many individuals who are transgender remain fertile after taking these medications, they can conceive biological children, there are fertility preservation measures that they can undertake, and that they have to be counseled on those risks. And as I said before, I can understand that that could be a hard tradeoff, but it's not unique to this care. There are other treatments for adolescents that likewise affect fertility, including some of those that SB1 expressly permits, like on intersex individuals who often have surgeries as infants that might permanently affect their fertility. I would also say that if you are concerned about fertility, there are measures the state could undertake, like requiring warnings, more informed counseling, trying to ensure that there's informed consent in this area. You also mentioned the possibility of regret. The record evidence demonstrates that the rates of regret are very low because for the population that has access to this treatment, so these are adolescents who have marked and sustained gender dysphoria that has worsened with the onset of puberty, they are very likely to persist in their gender identity. But if you're thinking about this from the standpoint of there's no harm in just making them wait until they're adults, I think you have to recognize that the effect of denying this care is to produce irreversible physical effects that are consistent with their birth sex because they have to go through puberty before they turn 18. So essentially what this law is doing is saying we're going to make all adolescents in the state develop the physical secondary sex characteristics consistent with their gender or with their sex assigned at birth, even though that might significantly worsen gender dysphoria, increase the risk of suicide, and I think critically make it much harder to live and be accepted in their gender identity as an adult because if you're requiring someone to undergo a male puberty and they develop an Adam's apple, that's going to be hard to reverse and they're more likely to be identified as transgender and subject to discrimination and harassment as adults. So I think the relevant question is you have this population of adolescents and there are documented very essential benefits for a large number of them and maybe a small number that will regret this care just like with any other medical care, but for the state to come in and just say across the board you can't have the medication because of your birth sex, we don't think that's a tailored law. You acknowledge there is some group, though, who later changes their mind and wants to detransition. That doesn't defeat your case. I just want to make sure you acknowledge there is, as a factual matter, some group of people. Yes, yes. We're certainly not denying that some people might detransition or regret this care, but all of the available evidence shows that it's a very small number. Then to pick up on the Chief Justice and Justice Alito's questions, it's obviously evolving debate. I mean, just in the last couple years in Europe, big changes in terms of how they're thinking about it and how they're thinking about these risks and benefits that you and I have just been talking about and you've been elaborating. If it's evolving like that and changing and England's pulling back and Sweden's pulling back, it strikes me as pretty heavy yellow light, if not red light, for this court to come in, the nine of us, and to constitutionalize the whole area when the rest of the world, or at least the countries that have been at the forefront of this, are pumping the brakes on this kind of treatment because of concerns about the risks. We certainly are not asking the court to set forth some bright line constitutional rules in this space that is going to really take further debate and evaluation of regulatory options away from states. We think, as I mentioned, that the court really only needs to decide the first order question here of whether this law classifies based on sex. I think that's entirely distinct from some of the concerns we've identified about what justifications the state has. Do you think that West Virginia law you mentioned is constitutional? I think it would likely satisfy heightened scrutiny. It hasn't been subject to adversarial testing because I don't think anyone has sued to challenge it, so I haven't looked at the record that West Virginia would build, but I do think that there is room here for states to enact tailored measures to try to guard against the kind of risks that you're concerned about and that the state has identified. And last topic, on the heightened review, and you say all we need to do is do heightened review and that's kind of a minimal step. I'm not sure, really, that the follow-on effects of that could be pretty significant. I think Justice Kagan alluded to that in her question, or at least raised that as a question. And I want to ask in particular about one thing. If you prevail here on the standard of review, what would that mean for women's and girls' sports in particular? Would transgender athletes have a constitutional right, as you see it, to play in women's and girls' sports, basketball, swimming, volleyball, track, et cetera, notwithstanding the competitive fairness and safety issues that have been vocally raised by some female athletes seen in the amicus brief of the many women athletes in this case? So can you explain how intermediate scrutiny would apply to women's sports? Yes, and just as a threshold clarifying point, I want to be clear that when it comes to access to sex-separated spaces like sports and bathrooms, courts already recognize that those are facial sex classifications that trigger heightened scrutiny. So it's actually not the question teed up here about how to classify the law in the first place or how to identify whether it's a sex classification. Instead, that's taken as given in that litigation. And the entire focal point of the disputes in those cases has been, well, does the state have an important governmental interest and does it need to draw the lines to exclude transgender people? Right, but how would intermediate scrutiny, which we may not, if we went to intermediate scrutiny, there's a possibility we would apply it here. How would it apply to, in your view, and maybe you don't have fully informed views, which would be fine, but how do you think it would apply to sports? So courts have split on that issue, and I hesitate to try in a vacuum without an actual record to try to opine on the state's justification and whether it will satisfy that standard. It's obviously a different set of governmental interests that are being asserted there, and those would have to be analyzed in their own right. But I think that this court, if it wants to preserve space to make clear that nothing here should be understood to affect the separate questions that are arising there, the court could very well do so, and we would have no objection to explicit language saying this decision does not in any way or should not be understood to affect the separate state interests there that have to be evaluated on their own terms. Okay, but looking ahead, do you think it's logically possible as a matter of constitutional decision making to say that laws like the one at issue here do not satisfy intermediate scrutiny, but laws that restrict women's and girls' sports in a way that transgender athletes cannot participate would satisfy intermediate scrutiny? Is that logically possible? Oh, yes, definitely. So we do think intermediate scrutiny applies in both contexts, but there are a different set of state interests at play, and I think one readily apparent difference is that in the context of sports, there are arguments made that that affects the rights of cisgender women and that the ability to allow transgender women to compete on those teams is going to be other-regarding in the sense of having those external impacts. There's nothing like this here. Allowing transgender individuals who have carefully thought about this and consulted with their parents and their medical team to access these medications that have health benefits recognized here and abroad in no way affects the rights of other people, and so I think the court could well understand the statute here to fail intermediate scrutiny even if it would survive there. Thank you. Justice Barrett? Morning, General. I want to pick up on one of Justice Kavanaugh's early questions. He pointed out that the burdens of the law fall equally on boys and girls because neither can transition, and you responded that it's kind of this sex classification or the expectations that one will conform to one's biological or gender assigned at birth. Why isn't that more of an Arlington Heights argument about intentional discrimination than if what you're really saying or what the legislature is really saying is the burden of this is going to be equally applicable. Neither boys nor girls can have access to these drugs, but the reason why is because we want girls to be girls and boys to be boys, at least until they're old enough to decide otherwise. So I think it would be wrong to overlook the fact that even separate and apart from any interest in conformity here or sex stereotyping, this is a law on its face that does not subject boys and girls to equal treatment, and you can see that if you look at how the law applies to some of the individual plaintiffs. Take Ryan Rowe, who is one of the individual plaintiffs here. He wants to take testosterone in order to live and identify as a boy, and he's prohibited by SB1 from doing so because his birth sex was female. But if you change Ryan's birth sex and suppose he was assigned male at birth, then SB1's restriction lifts. So he is not being treated the same as a boy who was assigned male at birth, and I think that is the kind of quintessential test the court has applied for purposes of identifying when there's a sex classification. So what would your argument be if a new drug is developed within, say, two or three years that just the only purpose of the drug, if there's no precocious puberty purpose or anything like that, the only reason to give this drug is it targets minors who have gender dysphoria particularly, and a state passes a law, you know, the FDA approves it, so it's available in some states, but a state passes a law saying no one has access to it. So now you don't have that whole thing falls out. So that would not be a facial sex classification, and there I do think that you would have to apply an Arlington Heights type of analysis to see whether the context and history demonstrate that actually the state was intending to treat people differently based on their sex, but I think that would function very differently from SB1. Well, I don't have an Arlington Heights argument here, too, because I take it one thing you think would be wrong with that law is the stereotyping function. Well, I think that Arlington Heights doesn't seem like the natural doctrinal home for a drug that says on its face you can't act inconsistent with sex, and I take your point about that's applying some equal rules to boys and girls, but that's true any time you have a law that says you can't act inconsistent with a characteristic. That means that there's going to be a restriction on males and a restriction on females. It's true of any other factor, too, inconsistent with race, inconsistent with religion. You might say, well, that's not just singling out one religion or one race or one sex for disparate treatment, but I think it actually increases the number of classifications when you're applying parallel restrictive rules on the basis of a protected characteristic across the board. So let me return to Justice Kagan's questions. You know, she asked you whether really the more natural way to think about this is that it is discriminating on the basis of transgender status rather than, you know, I feel like trying to make the Bostock-like argument, holding all things equal, or that you have to do this by reference to, you know, biological sex feels like an odd way to solve the problem and kind of that hypothetical I gave you about the drug that just has the transitioning purpose. So if we just head on, confront the question which you raised in the second part of your brief about whether transgender status should be a suspect class, one question I have is, at least as far as I can think of, we don't have a history of du jour, or that I know of, we don't have a history of du jour discrimination against transgender people, right? You point out in your brief that in the last three years there have been these laws, but before that we might have had private societal discrimination. But I don't know of, but am I, you know, is there a history that I don't know about where we have du jour discrimination? And my concern about it is this, all of the other suspect classes that we've recognized so far do have that long du jour history of discrimination. And, you know, the Equal Protection Clause applies to state action, so it feels like an odd fit to say that in their private lives people have discriminated against transgender people, therefore we're going to treat it as a suspect class for purposes of the Equal Protection Clause. So I think you may be right that the discrimination, historical discrimination against transgender people may not have been reflected in the laws, but I think there's no dispute that there is a broad history here and it hasn't just been confined to private actors. I think that if you actually look at the facts, there's a wealth of evidence to suggest that transgender people throughout history have been subjected to violence and discrimination and maybe lost employment opportunities or housing opportunities, even in contexts where there might be state public employment at play. And of course that's especially reflected now in the law where there has been this, I think, attention and focus on trying to limit transgender people from being able to live and identify consistent with their gender identity in our society. So I don't even understand the state to be disputing the historical discrimination point, but if you're approaching this from the standpoint of saying is this a group with a distinguishing characteristic that has no bearing on their ability to contribute and that needs some protection from the courts, I think if any group qualifies, this one does in light of the current laws and what might come in the future. And our basic argument is if you can look ahead and say maybe the states will ban medical care for adults who are transgender, maybe they'll ban adoption by transgender people or not allow them to be teachers, that doesn't look anything like the work a day economic regulation that just gets rational basis review. And I think the court could give effect to that intuition. Yeah, and I don't want to be misunderstood to say that I don't think there's a problem or that there hasn't been private discrimination. I guess it doesn't seem analogous to me to say race or gender or national origin. Those kinds of things because we did have to shore discrimination to point to. And so I guess what I'm thinking is when we are in the business of identifying suspect classes, you know, in Cleburne we expressed, and I'm not saying that this is analogous to Cleburne in that respect, but we expressed in Cleburne hesitancy, you know, to identify groups such as the elderly, you know, or the mentally disabled as suspect classes in part because those are judgments that are pretty hard for courts to make. And at least disordered discrimination of the sort experienced by women, you know, or people on the basis of race gives us something to point to if we're going to be identifying a new suspect class, which we haven't done for a long time. Yeah, and I, of course, take that point. And I should reiterate, we don't think the court has to confront it here. But in the cases involving age and disability, I understand the court to have approached those issues with somewhat different reasoning that age is something we all experience, that disability is a broad and diverse group, and that individuals with disabilities have been able to harness the majoritarian political forces to protect their rights. And none of that is true here. Transgender individuals are a discrete minority. I think there's no dispute that they are being subject to a wave of legislation across the states today. And I think that this is the kind of circumstance where the court could rightly recognize that heightened scrutiny should apply. Last question. Do you agree with me that the resolution of this case has no impact on the parental rights claim that the Sixth Circuit also addressed? That's right. I think we are not making a substantive due process parental rights claim here, and this court obviously didn't get grant review of that issue. I will say that I think parental rights are actually relevant to the Equal Protection Clause as well, insofar as it's significant to me that Tennessee, in choosing to categorically ban this care, is taking a sharp turn away from how it ordinarily handles parental rights in the medical decision-making space. And Justice Kavanaugh said, who decides here? But when it comes to medical risks and benefits, the state's general approach is to say parents get to decide, along with their doctors and their children. And so I think from the standpoint of under-inclusivity, it's pretty significant that Tennessee now is completely overriding parents' wishes when they are best positioned to know their and to have a good sense of whether the risks of this treatment are outweighed by the benefits. But this isn't, I guess my point is, even if we decided that this wasn't a sex-based classification that triggered intermediate scrutiny, that would not prevent parents from still asserting the substantive due process rights. Yes, yes, of course. I agree with that. I do think that the sex-based classification under Equal Protection Clause is the most straightforward way to think about what's going on here, though. Yeah. Thanks. Justice Jackson? So I'm glad that you've clarified that how we characterize this law is really the issue on the table today, not the risks or benefits or the policies that justify it, but how we characterize it. And I guess I think there might be some confusion a little bit. At least I'm confused, because there's so many lines that this statute could draw. The classification, as far as I can tell, is a line drawing, is the statute drawing lines. And there are lots of different ones. And Tennessee says this is drawing a line between people on the basis of age and purpose. And I totally see that. You say this is drawing a line on the basis of sex. I see that as well. But I guess my sort of initial question is, are those mutually exclusive? Do we have to choose between those characterizations? Isn't there a world in which this statute is doing both of those things? And the question, for equal protection purposes, is if you're right that there is a sex-based line being drawn, then to the extent the plaintiffs are implicated by that line, don't we have to apply heightened scrutiny in evaluating their claims? Yes, that's exactly right. And I think, of course, you could say this is a statute that classifies based on age and purpose and sex. Critically, we think that purpose incorporates sex here, because the purpose is expressly defined in terms of treatments that are inconsistent with sex. Right. So I think the problem with the safe approach is to say, well, it's just purpose going on. You take one look at that, and that just dissolves down into drawing a sex-based line itself. Can we put more flesh on that, though? Because, I mean, even if we separate out their age and purpose, and we just say, OK, so how is this actually drawing a line on the basis of sex? I think I heard you say it a couple times with respect to some examples, but I think it would be helpful to get on the table exactly who's falling on what side of the line in a particular situation related to sex. Yes. So the way that the sex-based classification is working here is that from the standpoint of any individual who wants to take these medications, their sex determines whether SB1 applies. John Doe, one of the plaintiffs, wants to take puberty blockers to undergo a typical puberty. But SB1 says that because John's sex at birth was female, he can't have access to those medications. And if you change his sex, then the restriction under SB1 lifts, and it changes the result. And my friends say, well, that also simultaneously changes the medical purpose of using these medications. We don't dispute that point, that it might also inherently change purpose when you're changing sex. But it doesn't have to, right? I thought of an example in which we have a plaintiff, a person, a minor, who would like to take this medication to affirm their gender as a male because the medication deepens their voice, for example. They want a deeper voice, and they're biologically male. They're taking the medication because that's what they want. They, I think, can get that medication. That's right. But a person who is biologically female, who wants to take the medication for that same purpose, to deepen their voice because they would like to live as a male, can't get it. Is that right? Correct. And that is on the basis of their sex. So the purpose is held constant with that example. It's not changing. What is changing is just the biological sex of the individual. I think that that's correct. But even in a circumstance where you might characterize that as treating delayed puberty instead of gender dysphoria, if you said, well, there is a different purpose there, even though the effects are exactly the same, and they want the medications for exactly the same reason, that doesn't eliminate the sex-based classification because sex only has to be one but-for cause of disparate treatment. And I think the state will say it's perfectly reasonable to treat different medical purposes or uses differently. We don't disagree, but that's something that's channeled to the application of heightened scrutiny. And if the state has a really good reason to say there's a danger in using these drugs if your birth sex was female and you want to deepen your voice, and it's different.  So that's Justice Alito's studies in all of this. Exactly. That can come in at that point. To the application of heightened scrutiny. And maybe the state can prove it up and show they have an important state interest, and they really have a reason to distinguish between who can have these drugs for which purposes based on their sex. But that doesn't eliminate the facial sex classification or provide a reason for this court to turn its back on 50 years of precedent saying, if you classify based on sex, you have to justify that. And it's interesting to me that you mentioned precedent, because some of these questions about sort of who decides and the concerns and legislative prerogatives, et cetera, sound very familiar to me. They sound in the same kinds of arguments that were made back in the day, 50s, 60s, with respect to racial classifications and inconsistencies. I'm thinking in particular about loving, and I'm wondering whether you thought about the parallels, because I see one, as to how this statute operates and how the anti-miscegenation statutes in Virginia operated. Yes, and I think the court has recognized that the Equal Protection Clause was intended to force some changes in society and get us to think more closely about the way that people were being classified, including when that was based on overbroad generalizations of how we expect them to live and order their affairs. And the court has made that clear in the sex discrimination cases as well, where it said sometimes these laws operate to disadvantage someone who falls outside the average description, and that person needs the protection of the court. Well, and I think I thought what was most interesting about the potential comparison to loving is that in that case, everyone seemed to concede up front that a racial classification was being drawn by the statute. That was sort of like the starting point. The question was whether it was discriminatory because it applied to both races and it wasn't necessarily invidious or whatever. But as I read the statute here, excuse me, the case here, the court starts off by saying that Virginia is now one of 16 states which prohibit and punish marriages on the basis of racial classifications. And when you look at the structure of that law, it looks in terms of you can't do something that is inconsistent with your own characteristics. It's sort of the same thing. So it's interesting to me that we now have this different argument, and I wonder whether Virginia could have gotten away with what they did here by just making a classification argument the way that Tennessee is in this case. Yes, I think that's exactly right, that there is absolutely a parallel between any law that says you can't act inconsistent with a protected characteristic, and in all other contexts, the court has recognized that as a facial classification based on that characteristic. And Tennessee even concedes the point when it comes to dress codes and to seeking a profession inconsistent with sex. But I think one other way to look at this, Justice Jackson, is that to me it would be a remarkable proposition for this court to say that a statute that on its face says you can't have medications inconsistent with your sex, and in part that's because we want you to appreciate your sex, isn't drawing a sex-based line in the first place. That would have no correspondence to or grounding in the text of the statute or how it works in operation or what effects it produces for individuals on the ground. Thank you. Thank you, counsel. Mr. Frangio? Mr. Chief Justice, and may it please the court, on its face SB1 bans medical care only when it is inconsistent with a person's birth sex. An adolescent can receive medical treatment to live and identify as a boy if his birth sex is male but not female. And an adolescent can receive medical treatment to live and identify as a girl if her birth sex is female but not male. Tennessee claims this sex-based line drawing is justified to protect children. But SB1 has taken away the only treatment that relieved years of suffering for each of the adolescent plaintiffs. And critically, Tennessee's arguments that SB1 is sex-neutral would apply if the state banned this care for adults too. By banning treatment only when it allows an adolescent to live, identify, or appear inconsistent with their birth sex, SB1 warrants heightened scrutiny under decades of precedent. Because the Sixth Circuit failed to apply that standard, this court should vacate and  I welcome the court's questions. If you are successful, what would your remedy be? Your Honor, if we're successful here, the remedy would be to enjoin the state of Tennessee defendants from enforcing SB1 as applied to our individual plaintiffs. So, in practical terms, what would it be? What would you get? Wouldn't you get the, you would get different treatment based on sex? In practical terms, what it would mean is that an individual like John Doe who was receiving medical treatment to undergo a typical male puberty prior to SB1 and is now barred from doing so because his birth sex is female could then receive that treatment as he had been doing with the consent of his parents. So, his sex would no longer be the basis for the denial of the medical care that his doctors recommended and his parents consented to. Counsel, is there any significant respect in which your position departs from that of the Solicitor General? No, Your Honor. The only thing that, the only argument that we make before the court here that the Solicitor General has not advanced is that this is a law that fails under any standard of review. That it is so discontinuous with the asserted interest in protecting children and therefore fails under any standard. But we think, as the Solicitor General made clear in her remarks, that it is clearly a sex classification on its face and should be resolved on that basis and remanded for the Sixth Circuit to apply that standard in the first instance. Is there anything you would like to add? Maybe there isn't, but with respect to the Solicitor General's responses to my concern that this is unlike a case like Craig v. Bourne, unlike a case like Morales, and those where it was quite clearly simply stereotyping with respect, you know, can men have the same rights as women with respect to adoption and the liquor laws? This does strike me whether, whatever you think about the disagreements between where Europe was some years ago and where Europe is now, where Europe is, where the United States is, in that it is quite a distinct type of inquiry that involves medical expertise, predictive judgments in the medical area than in those cases. I don't dispute, Mr. Chief Justice, that at the application of heightened scrutiny, there will be particular considerations that involve the underlying medical evidence as there always is. But I don't think that it would break new ground to apply heightened scrutiny here. The purpose of applying heightened scrutiny has been because, in part, we don't know at the outset whether a classification is benign. And many justifications for sex-based differential treatment in law were defended on the ground of biological differences and were upheld by the court under rational basis. And the role of heightened scrutiny is not to make sex a proscribed classification. It is just to shift the burden to the state to show their work and show that, in fact, this is a law that substantially advances an important governmental interest. Counselor, are there other situations, the Chief Justice's question just made me think of this, in which any of our levels of heightened scrutiny, whether they be intermediate or strict, require courts to make the judgment, the means-ends calculation in this kind of medical context? Because I agree with you. I mean, I can see your point, like, well, you know, as a matter of logic, we should shift this to that stage, assuming that the suspect class is triggered and we say this is sex classification. But is there any other situation in which courts get into that in the case of scrutiny? I mean, so I would point, Your Honor, to recent cases involving the COVID-19 pandemic, in which many cases came up before this court in which the states were regulating undeniably in areas of public health and evolving science. And the court repeatedly made clear that, yes, of course, the states have latitude through their police power to regulate. But when they do so in ways that classify based on suspect lines or infringes constitutional rights, then heightened scrutiny remains the standard that the courts apply to ensure that the state is advancing an important governmental interest. Now, I guess I'm thinking of this last follow up. But even in those COVID-19 cases, you know, courts weren't and we certainly weren't diving deep into the medical evidence and comparing Europe and America and looking at research. I mean, this would be, I think, of a different order. Do you agree? I don't agree, Justice Barrett, in the sense that I do think it is precisely the role of the courts to assess the tailoring and look at the evidence, whether it's presented through expert testimony or not. It is not the role of the court necessarily to say definitively these risks outweigh these benefits or vice versa, but do what the district court did here, which is to look at the assertions of harm, make comparisons to how Tennessee treated all other medical care, and then see whether or not Tennessee had met its burden under heightened scrutiny. That type of tailoring inquiry, I believe, is precisely the role of the court. Counsel, in the COVID, I have a colleague to my right, whom I think very highly of, who spoke about the need of the courts to look at that evidence to ensure that there wasn't suppression of religion, correct? That's correct, Justice Sotomayor. Now, with respect to Justice Barrett's question on COVID, in my mind, it's a little more similar to the bathroom situation, because there, COVID was a risk not just to the individual and a threat to their own life, but their contact with others could threaten others. So the compelling state interest was different than just a pure medical issue, correct? That's correct. I totally agree the state interest is different. All right. With respect to treating that issue, you can hear from some of my colleagues that they're worried that, and there is a plethora of science in this area, both that developed in Europe and the lower court hasn't really looked at it, no one has, that courts are ill-suited to that. Why do you think they're not? What about the fundamental role of the court makes us suited to answer those questions? Well, I think first, Justice Sotomayor, the role of the court is to ensure that when the government draws lines based on suspect classifications, that the states are tested to ensure that they're substantially advancing an important governmental interest. And when it concerns underlying questions of medicine or science, the judges and the lower courts have every ability to assess the testimony before them, as the district court did here. This is not an area where I suggest, I believe Tennessee is saying that medicine is altogether an area in which suspect classifications have no bearing on the judicial inquiry. It is precisely the role of the court to ensure that the government of Tennessee has substantially advanced an important governmental interest. I have a small question to finish with. The regret issue that was raised to the Solicitor General, respondents cite a figure of 85% of children expressing gender dysphoria regret later. You use a figure of 1% of minors who receive this treatment expressing regret. Can you tell me where those figures lie and exactly what the difference is between that 1% of children who receive these treatments expressing regret and the 85%? Certainly, Justice Sotomayor. So the first point I would say about the 85%, and we addressed this on page 22 of our reply brief, that's a misleading figure for two reasons. I think most critically, it refers to older studies of prepubertal children. And everyone here agrees that the medications that are banned by SB1 are only prescribed to individuals after the onset of puberty. And so in JA 151 to 153, the evidence shows that once an adolescent reaches the onset of puberty, their likelihood to ultimately desist and identify with their birth sex is very low. And then as to the question of the 1%, the question of regret, which is a different question than what happens with prepubertal children, the record shows there that the rate of regret when people receive this medication after the onset of puberty is as low as 1%. And that's in JA 131 to 133. And I think what's important here, and the Solicitor General mentioned this, is that it's exponentially lower than the rates of regret of treatments that are expressly permitted by SB1. Thank you, Counsel. Could we explore what intermediate scrutiny might look like in operation in assessing laws like Tennessee's? So the Solicitor General on page 48 of her brief lists a lot of things that she says, well, if Tennessee were really concerned about the health and welfare of these minors, it would have taken into account a variety of things. So one is waiting periods. Another is whether puberty blockers should be exempted. Another concerns things to make sure that the future of these minors is properly respected, even though they personally cannot make mature judgments about potentially irreversible procedures. So she mentions things like two-parent consent or counseling, readiness criteria, age recommendations, licensing certification or reporting requirements for physicians, and other guardrails which are not specified. So if intermediate scrutiny were the regime that would apply, would it not be the case that judges would have to decide whether a particular package containing this much of that and that much of the other thing is sufficient? Wouldn't this be endless litigation with the decision based on determinations by lay judges regarding complicated medical issues? So if I could make two points in response, Justice Alito. And the first is going back to the Solicitor General's example of West Virginia, where West Virginia looked at the underlying science and instead of categorically banning this medical treatment, created pathways with guardrails for individuals to access medical care. There has been no litigation over West Virginia's law. And if there were, as if there were in other contexts, the question would remain whether or not the state could make out the showing that this is being treated in such a substantially different way than other forms of medical care. I do think that judges are equipped to make those determinations as they do in many other contexts. A lot of categorical statements have been made this morning in argument and in the briefs about medical questions that seem to me to be hotly disputed. And that's a bit distressing. One of them has to do with the risk of suicide. Do you maintain that the procedures and medications in question reduce the risk of suicide? I do, Justice Alito, maintain that the medications in question reduce the risk of depression, anxiety, and suicidality, which are all indicators of potential suicide. Do you think that's clearly established? Do you think there's reason for disagreement about that? I do. I do think it is clearly established in the science and in the record. I think as with all underlying questions of looking at evidence, there can be disagreement. I don't dispute that. But here, and sort of going back to questions about the CAST review, for example, the CAST review only looked at studies up until 2022. Well, I don't regard the CAST review as necessarily as a Bible or as something that's true in every respect. But on page 195 of the CAST report, it says there is no evidence that gender-affirmative treatments reduce suicide. What I think that is referring to is there is no evidence in the studies that this treatment reduces completed suicide. And the reason for that is completed suicide, thankfully and admittedly, is rare. And we're talking about a very small population of individuals with studies that don't necessarily have completed suicides within them. However, there are multiple studies, long-term longitudinal studies, that do show that there is a reduction in suicidality, which I think is a positive outcome to this treatment. Let me ask a question about another issue that came up during Justice Kagan's questioning and Justice Barrett's questioning in particular, and that is whether transgender status should be regarded as a quasi-suspect classification. And Justice Barrett referred to one of the things that our cases have mentioned in explaining when something should be classified as a quasi-suspect classification, and that is a history of discrimination. Another one is immutability. Is transgender status immutable? May I answer, Mr. Chief Justice? Sure. So I would say that under this Court's consideration of that criteria, it is a distinguishing characteristic. Transgender people are characterized by having a gender identity that differs from their birth sex. That is distinguishing and discrete. And that also within the characterization, I would also point, if I could, to the history of discrimination, and there are many examples of in-law discrimination, exclusions from the military, criminal bans on cross-dressing, and others. Thank you, counsel. I think I lost track of the discussion you were having about COVID. What was the point you were trying to make? Somebody was trying to make it. Yes. I think it was me, and the point about COVID and the question of whether or not this Court has ever considered applying heightened scrutiny to contexts in which states are grappling with evolving medical evidence, and I would point to Justice Gorsuch's statement in South Bay United Pentecostal, in which the purpose of heightened scrutiny, even when the government is grappling with experts of a medical character, is to still test whether or not that infringement on an individual right or that use of a suspect classification meets the heightened scrutiny standard. It's not exempt simply because it is in the context of public health or medicine. Well, I don't want to relive the COVID cases. But it does seem to me that one of the issues that came up, and as to which courts around the country had vastly different views, was the lack of knowledge about precisely how what was going on, what the effects were going to be, what the remedies were going to be. And if this is similar to that, I think that would be very troubling to say that in such an evolving situation, we are going to decide what the right approaches are. I mean, you said at some point that this Court is just as qualified as Tennessee to make the decisions here. And it's not really so much a question of qualifications, it's more questions of constitutional allegation of authority. And we might think that we can do just as good a job with respect to the evidence here as Tennessee or anybody else. But my understanding is that the Constitution leaves that question to the people's representatives rather than to nine people, none of whom is a doctor. And particularly in, maybe I'm just repeating myself, but you can look, should we follow the United Kingdom position from three years ago? Should we follow the United Kingdom's position now? It seems to me that it is something where we are extraordinarily bereft of expertise. Well, Mr. Chief Justice, if I could first respond to the first half of your question about whether or not this is comparable in terms of the underlying science with respect to COVID-19, and I think absolutely it is not. I've merely used that example to say that the Court has not hesitated to suggest that heightened scrutiny applies in contexts that deal with medicine and science. And then with respect to what is the role of the Court, I continue to think it is to test whether or not a law is properly tailored. And that is what the District Court did here. And in fact, the underlying science and the evidence showed that Tennessee's assertion of harm and their prevalence were not supported. The District Court made factual findings to that effect of which Tennessee has not argued were clearly erroneous. And so what is left here is just bare rationality review. Tennessee is in essence saying, let's not look at the evidence at all, whether this is a law that bans this medical treatment for minors or for adults, that in all other contexts, what Tennessee does is recognize that there are risks and there are benefits. And usually the state regulates by informing patients of the risks and tailoring to minimize them. Here what they've done is impose a blunderbuss ban, overriding the very careful judgment of parents who love and care for their children and the doctors who have recommended the treatment. Thank you. Justice Thomas? The point I was getting at with respect to remedies is normally in equal protection cases, there's a difference between one group and another. And boring it would be that the women could buy alcohol, but the male students could not. And what would that be in this case? So two points, Your Honor. I think that what the birth males can do that birth females cannot do is receive medical treatment to live and identify as boys. And what birth females can do that birth males can't do is receive medical treatment to live and identify as girls. Okay, let's change. What if, would you make the same argument if we were only talking about puberty blockers? If it was puberty blockers, I would point to John Doe, who is receiving puberty blockers. The purpose of receiving puberty blockers for John Doe is so that in the future he can undergo a typical male puberty. Actually, I'm talking about from an equal protection standpoint, the difference in treatment. Normally in these cases, one group receives something that the other group does not. And I'm trying to make, discern that in this case. And so what I would say to Justice Thomas is that a birth sex male can receive puberty blockers to undergo a typical male puberty, and a birth sex female cannot. And if I could slow it down and just explain a little bit how that works. If you're someone who was born male and you are going through puberty too early, you want to be able to have a final adult height that is typical of boys. You may receive puberty blockers so that you can develop as a typical boy. Someone who has a sex of female at birth is also receiving puberty blockers so that they can undergo a puberty like other boys. And so it is the same purpose. And what makes the treatment prohibited for the birth sex female is their sex. Justice Alito? Counsel, I don't think you had a chance to finish answering my question whether transgender status is immutable. You cited a bunch of other criteria. But is it immutable? I think that the record shows that the discordance between a person's birth sex and gender identity has a strong biological basis and would satisfy an immutability test. And I also think under this Court's precedence for determining whether something is a suspect or quasi-suspect classification, a distinguishing characteristic is sufficient. Does the category of—does transgender status apply to individuals who are gender fluid? I think that the distinguishing characteristic is to have a birth sex that does not align with—or a gender that does not align with one's birth sex. So it may include people who have different understandings of their gender identity, but I think it is still the distinguishing characteristic of a birth sex and a gender congruent. Are there individuals who are born male, assigned male at birth, who at one point identify as female, but then later come to identify as male, and likewise for individuals who are assigned female at birth, at some point identify as female—I'm sorry, identify as male, but later come to identify as female? Are there not such people? There are such people. I agree with that. So it's not an immutable characteristic, is it? Well, I think people's understanding of it shifts, but the evidence shows that there is at least a strong underlying basis. And I think the normative reason for that particular consideration is whether or not this is something that someone should or could change, and whether they should have to change it in order to receive constitutional protections. And I think transgender status squarely fits within that. We have said that having a disability is not a suspect or quasi-suspect classification. So if we were to agree with you on the question of quasi-suspect classification, how could we justify saying, for example, that a person who is schizophrenic does not fall within a category that distinguishes on that ground as not a suspect classification? And I'm not suggesting that gender dysphoria is a disease, a mental illness. I'm not suggesting that at all. I'm just saying, how could we justify that different treatment? It's immutable in the sense that there isn't any cure for it. There's been severe discrimination against people suffering from schizophrenia. At one point, they were locked up in hellish institutions. They can make a valuable contribution to society. Think of John Nash. How would we distinguish that? Justice Lito, what I think would be the difference is that in Cleburne, the court in essence said, as to the distinguishing characteristic, that this was a large and diffuse group of individuals who have different forms of disabilities, and that that group of people had been able to secure some protection through the legislative process. But again, if this court certainly does not have to reach the question of transgender status as a quasi-suspect classification, SE1 on its face hinges its prohibition on inconsistency. Well, I understand that. But would you dispute the proposition that transgender status is a very broad category? Doesn't the American Psychological Society Association say it's an umbrella term? I don't know exactly what the American Psychological Association says, but I don't dispute that there are people who fall within a transgender identity who may not fit into a binary identity. I still think that the distinguishing characteristic applies to every single transgender person, which is a birth sex that is inconsistent with their gender identity. And of course, here on SB1, this is a law that I think is easiest to understand in the most straightforward classification. Thank you. So when asked whether you differed from the SG's position, I assume that if you win in this proceeding, what you're asking for us to reverse is the Sixth Circuit conclusion that rational basis review applied, correct? That's correct. Now, you think, as does the other side, that each of you should win on that question, but are you differing from the SG that that should be remanded to the court below to apply strict intermediate scrutiny in the first instance? No, Justice Sotomayor, we're not disagreeing. Now, with respect to Justice Thomas's question, I'm not sure you answered it. You did, in part, and you said the relief you're seeking in the lawsuit, assuming you win on the intermediate standard review, is to permit your plaintiffs to receive the medication other children receive. I don't know if he was suggesting that one of the things we can go up in discrimination or we can go down, which is, but I don't think we've even decided who makes that choice, because the other alternative is to block the usage of all of these drugs for all children, which would present a very different than Arlington Heights, perhaps, question, but the point is that what the relief is is still something that has to be determined as well. Well, so if I could clarify, Justice Sotomayor, I don't think that the relief we're seeking is for our clients to receive the medication. The relief we're seeking is for SB1 to stop being a barrier to their ability to continue to access medical care and make the individualized assessment with their doctors, so it is just simply an injunction of the barrier to the medication that they have been receiving in  Got it. Thank you. Justice Kagan? Justice Gorsuch? Justice Kagan? Two basic questions. So whether we apply rational basis or intermediate scrutiny, either way, you end up looking at the state's justification, and they are articulating a health and safety justification, so it's not simply morals legislation as they've described it. It's health and safety justification, and it seems that there are risks and benefits both ways here, so it's very hard to weigh those, at least as the briefing has set out the issues. If the treatment is barred, some kids will suffer because they can't access the treatment. If the treatment is allowed, these treatments are allowed, some kids will suffer who get the treatment and later wish they hadn't and want to detransition. At least that's how I see the positions set out in the briefs. And so there are risks both ways in here, allowing the treatment or not allowing the treatment, and how to choose there is a very difficult judgment call, it seems to me, but it's one, it's a difficult judgment call as a matter of policy, and then for us to come in, and this is repeating what I said earlier, but I want your reaction to it, for us to come in and to choose one side of that, knowing that either way, people are going to be harmed. This is, there's no kind of perfect way out, at least as I've read the briefs here where everyone benefits and no one is harmed, right? That the difficulty of the issue is some people are going to be harmed. And then the question becomes, has the court choose which group? Why isn't that a choice for policy makers as best they can to make that choice in the first instance? So I'll just throw that out there and take your reactions and anything you want to say on that. Okay, so if I could just make a few points in reaction. Okay, I have one more point to add to that. And I don't think, with respect, that what you and the Solicitor General said, we'll just send it back to the district court and they'll make fact findings. It'll be back here in a year and we're going to have the same discussion as I see it. So just to get you thinking about that too. Go ahead, have at it. So a few points, Justice Kavanaugh. And the first is I don't see this as the court choosing what is the appropriate response here. What I see the role of the court is assessing whether the choice that Tennessee made is one that they can justify under heightened scrutiny. And so that question is whether or not by taking this decision away from the adolescents, their parents, and their doctors, based on claims of harm, that protects children and protects children from adverse side effects. And what I think the record here shows, and again, this is a preliminary injunction record, what it shows is that that broad categorical ban does not advance that interest. That doesn't mean that a more tailored response would not advance that interest, in which you may be able to actually come up with a solution to ensure that you are protecting those who may come to regret this treatment, which are much, much smaller than those who benefit and find it medically necessary, something like West Virginia did. And I think the relevant inquiry here is whether what Tennessee did meets their constitutional burden because they used sex-based classifications to pass this law. And then on two quick other points that, with respect to the difference between rational basis and heightened scrutiny, yes, of course, it will be weighing the state's asserted interest in both circumstances, but there's a world of difference between rational basis and heightened scrutiny. And we think the Sixth Circuit got it wrong by simply applying rational basis here. And to the question of, well, is remand a sufficient— Well, can I just stop you there? Even under rational basis, if there were no benefit to anyone, then it would probably lack a rational basis. So I guess, in the end, you still come down to there are risks and benefits both ways. Either way, you go here. And I don't know whether rational basis or intermediate scrutiny, however that gets applied, you still have to kind of look, is there a real justification here? I think you look at that either way. And I think the difference under heightened scrutiny, there's a chance to look at the evidence in a much more substantial way and have the state come forth and show whether they've met their burden. In terms of your question, Justice Kavanaugh, about, well, is it sufficient to just remand it, it will be back up here again, I would say two things. In response, I think that there are often examples where there's a threshold question and it goes back down on the application of heightened scrutiny. And I do think an instructive case is Johnson v. California here, in part because it gives us some guidance for what happens on remand and the application of scrutiny. And that, of course, was when the court was considering whether or not to apply strict scrutiny to racial classifications in prison or Turner deference. And when the court reversed and said the wrong standard was applied, strict scrutiny still applies, and sent it back down, it did so with guidance that even under strict scrutiny, the lower courts could take into account the particular context of a prison. And I think here, this court could send it back down with instructions to take into account the particular context. And just one point there. You agree that there's some group of people who receive the treatments who later wish they hadn't and wish to detransition. I know you say it's a smaller group. I understand that. I just want to make sure you agree as a factual matter there is some set of people. I agree as a factual matter, as there is in all areas of medicine. And then on the sports question, I want to get your reaction as well, which is, is it logically and legally possible to apply intermediate scrutiny and say that the Tennessee law and the other laws like it do not satisfy intermediate scrutiny, but laws that limit women's and girls' sports to exclude transgender athletes would be constitutionally permissible. Is that legally and logically possible? I agree with the Solicitor General that it's legally and logically possible, because in the application of heightened scrutiny, it's wholly different state interests that are being asserted. Thank you. Justice Barrett? Mr. Tregear, I wanted to give you a chance to see if—I'm not sure if you named all of the laws when we were talking about de jure discrimination. Before, you mentioned bans on cross-dressing and bans on military service. And I had thought of the military service, but I had not—I didn't know about the statutes prohibiting cross-dressing. Could you think of others? Are there— I mean, I would say that there are other examples that exist in which sometimes homosexuality and transgender status are sort of lumped together in discriminatory frameworks as language has changed. I think the most salient to me would be the cross-dressing bans and the explicit bans on military service for transgender individuals.  And thinking about, you know, when we identify suspect classes, the factors that we've considered, one of the ones that the Sixth Circuit addressed was political power. Do you want to—do you have a reaction to the Sixth Circuit's discussion of that? I would just say, Justice Barrett, that I think looking out at the country at the moment, that there is a significant challenge for transgender people to protect themselves in the political process where you do have laws excluding transgender people from places where they need to go in all aspects of life. And there is a difficulty in that type of majoritarian protection. I think that's precisely what the political powerlessness prong of the text accounts for. Thank you. Justice Jackson? So I guess I'm suddenly quite worried about the role of the court questions and the constitutional allocation of authority concerns, because I understood that it was bedrock in the equal protection framework that there was a constitutional issue in any situation in which the legislature is drawing lines on the basis of a suspect classification, that it's a constitutional question that is being raised when that is happening as a threshold matter. And then you may get into why is it happening? What is the justification? And you've said here at the podium today that the different levels of scrutiny account for how strong the government's evidence has to be for doing that. And the court really holds them to it in a heightened scrutiny scenario. But the kind of initial issue is that a law is drawing lines on the basis of some suspect classification. Does that accord with your understanding of what we normally do? And that's a question for the court, because it's a constitutional question. Is the statute doing this, right? Yes, I completely agree with that, Justice Jackson. That's precisely why we think heightened scrutiny applies here, because this is a statute that on its face draws. All right. And to answer the question, is this statute doing this, I understood that we had a sort of two-step framework for looking at it, that we don't just kind of launch into an assessment of the evidence or what the state is, why the state is saying that they're doing this or the scientific basis for it, that we're looking at something else when we're trying to determine is a classification being made, right? Yes. And I guess my real concern, and maybe I'll just ask you to react to my loving parallel, because I'm getting kind of nervous, is that in loving, those same kinds of scientific arguments were made. So I'm reading here where the court says the argument is that if the Equal Protection Clause does not outlaw miscegenation statutes because of their reliance on racial classifications, the question of constitutionality would thus become whether there was any rational basis for a state to treat interracial marriages differently from other marriages. On this question, the state argues the scientific evidence is substantially in doubt, and consequently, the court should defer to the wisdom of the state legislature in adopting its policy of discouraging interracial marriages. And so for me, this kind of idea that the way we look at it is not first, are you drawing these classifications, and then state, give us your evidence so we can make sure that there's a proper fit, if instead we're just sort of doing what the state is encouraging here in loving, where you just sort of say, well, there are lots of good reasons for this policy, and who are we as the court to say otherwise? I'm worried that we're undermining the foundations of some of our bedrock equal protection cases. I share your concerns, Justice Jackson. I think one of the things that's happening in this case is we're seeing a lot of concerns that come in at step two of the analysis being imported into that threshold question of whether a classification has been drawn in the first instance. Concerns about real differences between males and females. That is exactly what heightened scrutiny is intended to test in the application of heightened scrutiny. If Tennessee can have an end run around heightened scrutiny by asserting at the outset that biology justifies the sex-based differential in the law, that would undermine decades of this court's precedent. Thank you. Thank you, counsel. Mr. Rice? Mr. Chief Justice, and may it please the court. Tennessee lawmakers enacted SB1 to protect minors from risky, unproven medical interventions. The law imposes an across-the-board rule that allows the use of drugs and surgeries for some medical purposes, but not for others. Its application turns entirely on medical purpose, not a patient's sex. That is not sex discrimination. The challengers tried to make the law seem sex-based this morning by using terms like masculinizing and feminizing, but their arguments conflate fundamentally different treatments. Just as using morphine to manage pain differs from using it to assist suicide, using hormones and puberty blockers to address a physical condition is far different from using it to address psychological distress associated with one's body. The Equal Protection Clause does not require the states to blind themselves to medical reality or to treat unlike things the same. And it does not constitutionalize one side's view of a disputed medical question. Half of the states, Sweden, Finland, and the UK all now restrict the use of these interventions in minors and recognize the uncertainty surrounding their use. These interventions carry often irreversible and life-altering consequences, and the systematic reviews conducted by European health authorities have found no established benefits. Politically accountable lawmakers, not judges, are in the best position to assess this evolving medical issue. The Sixth Circuit should be affirmed. I welcome the Court's questions. MR. BROOKS Both the SG and Petitioner have suggested that a better approach would be the approach of West Virginia. What's your reaction to that?  BROOKS Your Honor, my friend's arguments with respect to the alternative approaches is pure policymaking. As Justice Kavanaugh recognized throughout his questioning, they cannot stand up here and say that if these alternatives were imposed that there would be no detransitioners. So they cannot eliminate the risk of detransitioners. So it becomes a pure exercise of weighing benefits versus risk. And the question of how many minors have to have their bodies irreparably harmed for unproven benefits is one of his best lessons. MRS. GOTTLIEB I'm sorry, Counselor. Every medical treatment has a risk, even taking aspirin. There is always going to be a percentage of the population under any medical treatment that's going to suffer a harm. So the question in my mind is not do policymakers decide whether one person's life is more valuable than the millions of others who get relief from this treatment. The question is can you stop one sex from the other, one person of one sex from another sex, from receiving that benefit? So if the medical condition is unwanted hair by a nine-year-old boy who can receive estrogen for that because at nine years old if he has hair, he gets laughed at and picked on and his puberty is coming in too early. But a girl who has unwanted hair says or has unwanted breasts or a boy at that age can get that drug but the other can't. That's the sex-based difference. It's not the medical condition is the same. MR. GOTTLIEB We don't agree.  GOTTLIEB What you're saying, one sex is getting it and the other is not.  GOTTLIEB We do not agree that the medical condition is the same. We do not think that giving puberty blockers to a six-year-old that has started precocious puberty is the same medical treatment as giving it to a minor who wants to transition. Those are not the same medical treatment. MR. GOTTLIEB What you're saying is you're still depending on sex to identify who can get it and who can't. GOTTLIEB I don't think so, Your Honor. If a minor comes up to, a boy goes to the doctor and says I want puberty blockers to transition, the answer will be no. If a girl goes up to the doctor and says I want... MR. GOTTLIEB If a sex-neutral looking child walks into a doctor and says I don't want to grow breasts, doesn't the doctor have to know whether it's a girl or a boy before they prescribe the drug?  GOTTLIEB I don't think so, Your Honor. It needs to know...  GOTTLIEB I've got to tell you, I've made that mistake on children often, look at one of them and think it's a boy and then correct it and it's a girl and vice versa. I hope that you're not going to tell me you haven't made that mistake. MR. GOTTLIEB Well, I may have made that mistake, Your Honor, but I don't think that that is an example of where a sex-based line is being drawn.  GOTTLIEB Why not?  GOTTLIEB Because... MRS. GOTTLIEB Yeah, please.  GOTTLIEB Because all that matters is the medical purpose for which the drug is used. So if the minor comes up, if you have a biological...  GOTTLIEB No, it's the same medical purpose. Her hypothetical is I don't want to grow breasts. Same medical purpose. I'm trying to stop the development of breasts.  GOTTLIEB Well, Your Honor, I think that that likely would not be allowed under SB1 for a girl.  GOTTLIEB For a woman who is... For a girl.  GOTTLIEB Yeah, and it would also not be allowed under Tennessee law with respect to a biological boy.  GOTTLIEB Really?  GOTTLIEB Tennessee law doesn't just allow doctors to prescribe drugs without a medical purpose. They can't prescribe...  GOTTLIEB No, no, no, but the way I understood the law to work is it has to be inconsistent with your sex in order for it to be blocked. So I don't understand why a boy, you know, I don't understand why it would work in the way that you're saying. Why wouldn't it be differentiating on the basis of gender? A girl who doesn't want to grow breasts for whatever reason could or could not get it. GOTTLIEB Does not want to grow breasts without a medical reason could not get it. GOTTLIEB And a boy who doesn't want to grow breasts could or could not get it. GOTTLIEB Could not get it if there was no medical purpose. There has to be a medical purpose for these drugs. All my friend's arguments rest on conflating different medical purposes. GOTTLIEB But they couldn't get it not under this law, right? Because this law is operating around the inconsistency. So if they couldn't get it, it wouldn't be for some other reason, right? GOTTLIEB But we have other laws in Tennessee law that prevent malpractice and that prevent the use of drugs for a non-medical purpose. GOTTLIEB I understand, but this law is the one that is being challenged today and we're trying to decide whether or not it's operating on a sex-based basis. So what about my lower voice hypothetical, all right? So a biological boy comes in and asks for hormone treatment to deepen his voice in order to affirm his masculinity because it hasn't come and he'd like to deepen his voice. Can he get it? GOTTLIEB If there's no medical purpose, no. No, that's the medical purpose. I don't understand what you mean. The purpose is to bring on a deepening of their voice. GOTTLIEB Let me try to rephrase. If there's no medical condition, the answer is no. You cannot use testosterone for purely cosmetic reasons. It's a Schedule III drug. GOTTLIEB In this statute or in another statute? GOTTLIEB In another statute. GOTTLIEB Okay, so setting aside that other statute, we're looking at this one and how it operates. This statute says something about inconsistency with your biological sex, and that's what I'm trying to test. The boy comes in, he asks for a hormone treatment to deepen his voice to affirm his masculinity. Can he get the treatment? Under this statute? GOTTLIEB Under this statute, no. But under Tennessee Code Annotated 63— GOTTLIEB The boy could not, under this statute, to get a medication that would deepen his voice? GOTTLIEB If there was no medical condition, no. That's the other statute. Under this statute, with respect to consistency, he could. GOTTLIEB Under this statute, he could. GOTTLIEB Okay. GOTTLIEB Under 63-6-21412, he could not. GOTTLIEB I understand. Setting aside that other statute, under this statute, he could. Now, looking at this statute, a girl comes in biologically and asks for a hormone to deepen her voice in order to affirm the identity that she chooses, which is masculinity. I'm asking you, would, under this statute, she be precluded from getting that treatment? GOTTLIEB She wants to—I'm sorry. One more time, Your Honor. GOTTLIEB She wants to get the medication in order to deepen her voice and affirm her masculinity. GOTTLIEB Your Honor, I think if it's for the purpose of identifying inconsistent with their sex, she would be barred from doing that under the statute. NISBET But isn't that the point, Mr. Rice, that if it's for the purpose of identifying with their sex—I mean, the prohibited purpose here is treating gender dysphoria, which is to say that the prohibited purpose is something about whether or not one is identifying with one's own sex or another sex. The whole thing is imbued with sex. I mean, it's based on sex. You might have reasons for thinking that it's an appropriate regulation, and those reasons should be tested and respect given to them. But it's a dodge to say that this is not based on sex, it's based on medical purpose, when the medical purpose is utterly and entirely about sex. GOTTLIEB Justice Kagan, we think that's a request for a substantive right to engage in nonconforming behavior. We don't think it's actually drawing a line based on sex. And again, the only way that my friends can point to a sex-based line is to conflate the use of puberty blockers to address precocious puberty with the use of puberty blockers to transition, and those are fundamentally different treatments. They have different effects on the body. They're used for different purposes. I actually think my friend's response to Justice Alito's hypothetical regarding puberty blockers is devastating, because that law draws no different lines than the law that's drawn in SB 1. It just doesn't use the words inconsistent with sex. So we use the words inconsistent with sex to describe a single prohibited medical purpose. We do not use it to draw lines between males and females.  GOTTLIEB Counselor, I want to be clear about this. I assume you agree with me that no matter how difficult the science may be and no matter how evolving it may be, at the end of the day, legislation on this subject is subject to judicial review. MR. ALITO I also want to be clear that the issue about the difficulty of regulating the science and attempting to figure out where to sort of stop and place the scale in the evolution is a matter that goes to the level of judicial review. Is that right? The level of the scrutiny that's applied? GOTTLIEB Yes, Your Honor.  ALITO Okay. Thank you. GOTTLIEB Counselor, given your argument, you're saying your state can block gender treatment for adults, too. MR. ALITO Your Honor, we think that if we're assuming a similarly worded statute, that there still would not be a sex or a transgender-based classification. GOTTLIEB So you're licensing states to deprive grown adults of the choice of which sex to  MR. ALITO Your Honor, I don't think that's a fair characteristic. GOTTLIEB That's what you're telling me, because you're saying to me rational basis would be the review for that kind of law for adults as well. MR. ALITO And this court has not hesitated to hold laws unconstitutional under rational basis review when they are rooted in unsubstantiated fears and prejudices. That's exactly what this court did in Cleburne. GOTTLIEB That's quite an interesting way to protect the population. MR. ALITO And to the extent, Your Honor— GOTTLIEB I thought that that's why we had intermediate scrutiny when there are differences based on sex, to ensure that states were not acting on the basis of prejudice. MR. ALITO Well, Your Honor, of course our position is there is no sex-based classification, but to finish the answer, to the extent that a law dealing with adults would pass rational basis review, that just means it's left to the democratic process and that democracy is the best check on potentially misguided laws. GOTTLIEB When you're 1% of the population or less, it's very hard to see how the democratic process is going to protect you. Blacks were a much larger part of the population and it didn't protect them. It didn't protect women for whole centuries. OPERATOR Mr. Rice, I have one factual question and one legal question. The factual question is, the Sixth Circuit mentioned that this is an off-label use, that the FDA is not authorized. Is that still true and is that just for children or is it for adults too? MR. RICE It's still true, I think, with respect to both children and adults. I know with respect to children, I'm not certain with respect to adults, but we do think that that's relevant in the sense that the FDA, when it approves drugs, it does so based off of the purpose for which the drugs are being used. We think that we are drawing the same type of distinction in our law between using one drug for different purposes. OPERATOR My legal question is, I wondered if you had a response. I was asking your friends on the other side about digital discrimination and what we should take account of if we're thinking about whether transgender people should be a suspect class for purposes of the 14th Amendment. Do you have a response to that, what we should be thinking about, or whether do you know the history of digital discrimination? MR. RICE I do not know the history of digital discrimination. Our frontline position is that the Court has gotten out of the business of creating new quasi-suspect classes precisely because it's a very unprincipled test when it comes to creating these classes. In some of the cases, political powerlessness means that you need protection from the majoritarian process. In other cases, it means can you gain the attention of lawmakers in the most recent Cleburne test. So the Court has not applied any form of principled analysis when it comes to creating these tests. It's been an exercise of judicial power. And in the intermediate scrutiny analysis that accompanies the quasi-suspect class, classification is no more principled, and the Court has often struggled to apply that as well. So we don't think the Court should even open the door for further judicial creation of new quasi-suspect classes. OPERATOR Okay. And last legal question. I was just going to ask you one. I have a second one. Could you address Justice Kavanaugh's questions about what the implications of this case would be for the athletic context or the bathrooms context? MR. RICE I would love to, Your Honor. So we think this is – we differ with our friends on the other side with respect to – their argument is that, well, there's a sex-based classification in sex-separated sports, so necessarily that means that we're – there's a sex classification, intermediate scrutiny applies. We are not actually seeing challenges to the sex classification. When these challenges are being brought, they're not arguing that we don't want there to be boys' and girls' sports. They're arguing we want there to be boys' and girls' sports. We just want to be classified based off of our gender identity. And so we think that is fundamentally a transgender-based challenge and not a sex-based challenge if you are not actually challenging the sex classification that is at issue. OPERATOR Can I ask you – so in my sort of loving parallel, Virginia, in your view, would not have been making a racial classification if they had just reworded their statute to say no person can get a license to marry for the purpose of uniting with another person whose race is inconsistent with their own. I took you to say that the use of the term inconsistent with their sex was drawing a line to prohibit one use of the medication. So why couldn't these statutes have been interpreted as drawing a line to prohibit one use of a marriage license? MR. BARTON We think that in a case like loving, when you look at the individual level, which we agree with our friends on the other side that the equal protection clause operates at the individual level, that if there is a line that is being drawn based off of race, like in loving where you had a white male who could not marry an African-American female under that law, that is a race-based line. You are creating multiple groups of permissible and impermissible behavior based off of race. Where we differ from our friends on the other side is we just don't think that there is any sex-based line in this. MS. BARTON I understand why not. The law here operates in the same way. There, the question of can you marry this other person depended upon what your race was. You could marry the other person if it was the same, consistent with your race. You couldn't if you couldn't. I take your law to be doing basically the same thing. You can get these blockers if doing so is consistent with your sex, but not if it's inconsistent. So how are they different? MR. BARTON Their use of inconsistent with sex and all these examples that they have in the briefing, those actually do create separate categories of conduct that is permissible either based on sex or based on race. But in this case, the only way that they can point to a sex-based line is to equate fundamentally different medical treatments. Giving testosterone to a boy with a deficiency is not the same treatment as giving it to a girl who has psychological distress associated with her body. These are, this is, this is not only different.  PEARSON And what's your basis for saying that? I'm sorry. Is it just because of why they're asking for it or is there some kind of medical, I took the SG to be saying that it operates on the body in the same way. So what's your basis for saying they're not the same?  BARTON I don't think it operates on the body in the same way. Testosterone. If you give a boy with a deficiency testosterone because he has constitutional delayed puberty, that allows him to go through and develop the reproductive organs associated with being a male. If you give it to a girl, it renders the girl infertile. So we have 8 to 12-year-olds. PEARSON Oh, I'm sorry. I thought your reasons for them being different was that you said they were for different purposes. I'd heard you say at the beginning the reason those two are different is because one wants them to transition and the other wants them for some medical purpose. To go back to my example in the introduction, I don't think anyone would say using morphine to assist suicide is the same treatment as using morphine to manage pain. It's the same drug, just like it's the same drug here, but they're being used for fundamentally different purposes. They have different effects on the body. And once you take out and recognize medical reality, then there is no argument that our law differentiates between treatments for males and females. Can I ask you about one of the purposes of this law? And I note that your brief does not talk a lot about this, but one of the articulated purposes of this law is essentially to encourage gender conformity and to discourage anything other than gender conformity. And I'm wondering how you think that plays into the analysis. I disagree with that characterization. Encourage minors to appreciate their sex and ban treatments that might encourage minors to become disdainful of their sex sounds to me like we want boys to be boys and we want girls to be girls. And that's an important purpose behind the law. And I understand that sentiment, but it's a fundamentally different sentiment and it's produced this law than the one that you're talking about now. Your Honor, if I could make a few points. First of all, it sounds like the question is rooted in a potential improper purpose based argument under Arlington Heights argument, which as Chief Judge Sutton pointed out below, that argument was never raised until it got to this court. Well, I'm less interested in sort of like the legal box to put this in and more interested in, you know, you're spending a lot of time talking about what exactly the classification is here and I think we've talked a good deal about that. But what produced this classification might be relevant to understanding what the classification is about.  And I would love to address. And what seems to have produced this classification is that we want to ban children treatments that might encourage minors to become disdainful of their sex. So we think that there's something fundamentally wrong, fundamentally bad about youth who are trying to transition. And that's the way this purpose seems to me. If I could try to unpack both of those, Your Honor, because I think both of those right in context do not support the narrative that Tennessee wants boys to live as boys and girls to live as girls. So the appreciate their sex reference in detailed and legislative findings, that is simply the recognition that given the high desistance rate among minors and given the tragic regret of detransitioners, that there is an interest in making sure that minors have enough time to appreciate their sex before undergoing life altering changes. So I think that has to be viewed in the context of the legislative findings, which both emphasize the detransitioners and the high rate of desistance. With respect to become disdainful of their sex, the challengers have never explained why it would be problematic to prevent interventions that could affirmatively cause minors to become disdainful of their sex and thus at issue for psychiatric conditions. And in fact, there are multiple studies, I would point to this court JA400, where minors actually their mental health and suicidality got worse after taking these interventions. Now, my friends on the other side may disagree with that research and that assessment of whether the findings of that study, but the legislature specifically noted those studies. So I think that statement was rooted in the notion that actually this is causing affirmative harm to minors who are undergoing the interventions. And that's why they were saying, we don't want these interventions that will cause minors to become disdainful of their sex. Go ahead. No, go ahead. No, go ahead. I'll be back. Justice Kavanaugh. At a big picture level, I think the argument on the other side, putting aside some of the trust parents rather than the state, particularly in a situation, as General Prelogger said, where there is not the kind of direct harm to third parties that you might see in other contexts like sports. Yes, Your Honor. So as my friends recognize, the parental rights question is not before this court. She explained how it informs. So just take the question as best you can. I think our position is that there are certain times in medicine, history has shown, where the states in their traditional role as regulators have had to intervene. And that's not because, of course, the parents are trying to do the best they can and get the best treatment for their kids. But we've had multiple instances in somewhat recent history where we have stuff like lobotomy, eugenics, that had widespread acceptance among the medical community. And the state had to intervene as a regulator to protect its children. Mr. Reich, just to let you kind of finish what you started to say to Justice Kavanaugh, you agree that the parental rights question is not before the court. So it would be open to parents to continue to press that point in other cases. We agree. And we think Chief Judge Sutton got it right. But we agree. Can I just ask you about, I don't understand at all the similarly situated argument that you make. And I hope that you can help me because I don't know how you can say both that girls and boys are not similarly situated at step one when this law is being evaluated and it's not making a sex-based classification. It seems to me that recognizing their lack of similarity as you do in making the argument is making a sex-based classification. I think our position is that if you're in the point where we're treating giving testosterone to a boy with a biological deficiency as the same thing as giving testosterone to a healthy biological girl who wants to transition, then there has to be some threshold inquiry that recognizes the biological differences between those two. Right. But when you're doing that, you're making a sex-based classification. I mean, the very argument carries with it the characterization that we're trying to identify here. You start by saying it's different to treat a boy who's using this medication for a particular reason from a girl who's, okay, so that's a sex-based classification. Haven't we dealt with step one now? We should be going on to step two. The intermediate scrutiny applies by the terms of what you're arguing. I don't think that we agree that we've checked the box at step one because there is no treatment that boys can receive that girls cannot. So we disagree with the notion. Didn't we already dispose of that kind of reasoning with our equal protection cases that looked at things like interracial marriage where we said even though it applies to both, it's still making a racial classification. Even though whites can't marry non-whites and non-whites can't marry whites in the statute, right? So both are equally disadvantaged. We said that's not an argument for why you shouldn't have a heightened scrutiny or why the statute is not making a race-based classification. And that's not the argument that we're making. We're not arguing that you can discriminate and draw lines so long as you do so both against boys and against girls. We're arguing there is no sex-based line. If you're a boy and you go in to get puberty blockers, you can get the puberty blockers if you're going to use them for precocious puberty. You cannot get the puberty blockers if you're going to use them to transition. That is not a sex-based line. That is a purpose-based line. So our fundamental point here is not that you can discriminate against both sexes in equal degree. Our fundamental point is there is no sex-based line here, and the only way they get to a sex-based line is by equating fundamentally different treatments that defy medical reality and defy how the statute itself sets out what is a treatment. And the treatments are different because of the biological sex of the person, right? I mean, that's what you said. The purposes are different because of the biological sex and why you're going in to get them. Not at all. I mean, with puberty blockers, the purpose, nothing turns on sex. Take puberty blockers. There's nothing that turns on sex as to whether there is a sex-based classification there. Everything depends on what is the reason that you are using those puberty blockers for. I'm happy to take more questions if the Court has them. Justice Thomas? A number of times you've mentioned off-labeled uses of these hormones. What are some of the other off-label uses that are not legal in Tennessee? So, for example, Your Honor, testosterone, we have a separate law that prohibits the use of testosterone for hormonal manipulation intended to increase muscle mass, strength, or weight without medical necessity. We have, like every state, we regulate medicine and we regulate the use of drugs. You cannot use drugs in the state of Tennessee if it's not for a legitimate, viable medical purpose. Here, through this law, all that we have done is make clear that these treatments, which are irreversible often, have significant effects on minors and often leave them with bodies that are infertile and permanently damaged, that you have to wait until you turn 18 to receive those types of treatments. A number of times you've tried to say what the classification that the state of Tennessee has advanced in this legislation. Would you spend a few minutes on that? Yes, Your Honor. So, again, we think that our law fundamentally draws a distinction based on medical purpose. I'll go back to puberty blockers. If a boy wants puberty blockers, the answer is yes, if you have precocious puberty, no, if you're doing this to transition. If a girl wants puberty blockers, the answer is yes, if you have precocious puberty, no, if you're doing this to transition. That is fundamentally a different treatment and what is dictating under this law is the use for which you are putting the drug. And just to kind of build out on the notion that these are not the same treatments, we talked about earlier testosterone. If you give it to a biological boy, it allows the boy to develop a normal body, a healthy body, whereas providing it to a girl causes a physical condition, hyperandrogenism. And that results in clitoromegaly, atrophy of the lining of the uterus, blood cell disorders, increased risk of heart attack. So the notion that the risks are the same when you give testosterone to a boy as when you give it to a girl are simply not borne out by medical reality. Justice Alito? Justice O'Meara? Justice Cave? Justice Cameron? Just one clarification. It's an obvious point, but I want to make sure you agree with it, which is you are not arguing that the Constitution takes sides on this question, as I understand it. You are arguing that each state can make its own choice on this question. So from your perspective, as I understand it, it's perfectly fine for a state to make a different choice, as many states have, than Tennessee did, and to allow these treatments, correct? Yes, Your Honor, that's correct. And we think that's because of what Your Honor has pointed out, that no matter how you draw these lines, there are risks and potential benefits and harms to people on both sides. And the question of how to balance those harms is not a question for the judiciary, it's a question for the legislature. Thank you. Can states make a different choice if doing so means that a state's law operates to treat its citizens differently on the basis of, name the suspect classification? I thought that was the work of the Constitution and the Equal Protection Clause. Your Honor, we don't think that it draws any lines based off anything. No, I understand. I'm not talking about this law. I'm going back to Justice Kavanaugh's suggestion that the Constitution doesn't play a role if the state is making a policy choice regarding issues such as these. And I guess I'm still seeing a role for the Constitution in circumstances in which the claim that is being made is that the state's choices are implicating the equal protection rights of its citizens. Your Honor, I think the point, I don't want to misstate the point, but I think the point is that the Constitution is neutral in the sense that it does not provide heightened protection based on any suspect classification. And thus, rational basis review applies in the presumption of legislative validity and the presumption that these types of policy choices are best left to the democratic process. I think that is exactly what the correct way to think about this case. Thank you. Thank you, Counsel. Rebuttal, General Prelinger. Thank you, Mr. Chief Justice. Two quick clarifying points. I want to make clear that Tennessee here is not regulating based on off-label use. Off-label use is extremely common in pediatrics, and we have pointed to a number of uses of these medications on page 40 of our brief, the very same medications that likewise are off-label use. If there are problems with safety and effectiveness, then that would not become the standard of care, and there are self-regulatory measures to address that issue. Justice Kavanaugh, you said this might be a space where each state can make its own choice, but I think it's important to recognize that my friend's arguments would equally apply to a nationwide ban if this were enacted by Congress, and so I think that the court should keep that in mind when thinking about the level of scrutiny here. There were a lot of questions about how to take account of disputed medical evidence when there might be some uncertainty, and I want to make a few points. As my friend acknowledged, that doesn't go to the level of scrutiny, so that doesn't mean that you should ignore a sex classification when one exists in the statute, but at the point of applying heightened scrutiny, the court can take context into account, and we're not asking courts to step in here and say, we want to figure out as a matter of policy exactly what the right approach is, but you can ask the familiar judicial questions like, does the state actually have any evidence to support its claims that there's a harm to adolescent health, and is this law severely over- and under-inclusive? And if the court conducts the analysis here in the first instance, this law doesn't look anything like a typical medical regulation to protect adolescent health. That would look like the West Virginia law, where you're tailoring it, but still leaving some possibility for care when it can have enormous benefits, and the reason it doesn't look like a typical medical regulation is because the legislature was doing something different in trying to get minors to appreciate their sex and not become disdainful. That's not a medical-based justification, but I think it shows exactly why the state drew the lines where it did. Finally, I think the court should think about the real-world consequences of laws like SB-1. Consider its effects on Ryan Rowe. As Justice Sotomayor noted, Ryan's gender dysphoria was so severe that he was throwing up before school every day. He thought about going mute because his voice caused him so much distress, and Ryan has told the courts that getting these medications after a careful consultation process with doctors and his parents has saved his life. His parents say he's now thriving, but Tennessee has come in and categorically cut off access to Ryan's care, and they say this is about protecting adolescent health, but this law harms Ryan's health and the health of all other transgender adolescents for whom these medications are a necessity, and the state says it doesn't even want the courts to take a look at whether this protects adolescent health, but the reason Ryan can't have these medications is because of his birth sex, and a sex-based line like that can't stand on rational basis review. Thank you. Thank you, counsel. The case is submitted.